UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1067

CASAS OFFICE MACHINES, INC.,

Plaintiff, Appellee,

v.

MITA COPYSTAR AMERICA, INC., ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Gilberto Gierbolini, U.S. District Judge]

Before

Torruella, Circuit Judge, 

Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.

Ricardo F. Casellas, with whom Mario Arroyo, and Fiddler,
Gonzalez & Rodriguez, were on brief for appellants.

Luis A. Melendez-Albizu, with whom Luis Sanchez-Betances, Sanchez
Betances & Sifre, Nilda M. Cordero de Gomez, and Jorge E. Perez-Diaz,
Federal Litigation Division, United States Department of Justice, were
on brief for appellee.

December 14, 1994


CAMPBELL, Senior Circuit Judge. Mita Copystar of

America, Inc. ("Mita") appeals from the district court's

order granting summary judgment and issuing a permanent

injunction in favor of Casas Office Machines, Inc. ("Casas").

The action began when Casas sued Mita and two fictitious

defendants, John Doe and Richard Roe, in the Superior Court

of Puerto Rico, San Juan Part. Organized under the laws of

California and with its principal place of business in New

Jersey, Mita removed the action to the United States District

Court for the District of Puerto Rico. After removal, Casas,

by an amendment to its complaint, replaced the fictitious

defendants with two named defendants, Caguas Copy, Inc. and

Oficentro J.P., Inc., which, like Casas, are Puerto Rico

corporations. Complete diversity of citizenship between the

parties was thus destroyed, although this fact was not called

to the district court's attention at the time. The district

court proceeded to deny Mita's motions to dismiss and for

summary judgment, and it allowed Casas's motion for a

permanent injunction enjoining Mita from impairing a contract

entered into with Casas. Now, for the first time on appeal,

Mita points out the jurisdictional problem caused by the

addition of the nondiverse parties. Mita asks us to vacate

the judgment below and order the district court to remand the

action to the Superior Court of Puerto Rico. Mita also

attacks the district court's decision on the merits, arguing

-2-

that summary judgment was improper and that the district

court erred in granting the permanent injunction.

I.

Incorporated in Puerto Rico, Casas sells and

distributes office and photocopying equipment in that

Commonwealth. In 1983, Casas entered into an agreement with

Mita, a supplier of office and photographic equipment, to

distribute Mita products in Puerto Rico. As noted, Mita is a

California corporation with its principal place of business

in New Jersey. Following a period of strained business

relations, Casas and Mita executed a second agreement in 1989

(the "1989 Agreement") granting Casas the exclusive right to

distribute Mita's products in the "Greater San Juan" area.

Paragraph 5 of the 1989 Agreement, however, provided that

Casas's inability to meet or exceed 85% of a set sales quota

would result in termination of the exclusivity provisions of

the contract. Asserting that Casas had failed to achieve the

85% threshold, Mita terminated Casas's exclusive distribution

rights but retained Casas as a distributor and

designated two new distributors in the "Greater San Juan"

area.

Casas responded on February 1, 1991, by suing Mita,

John Doe, and Richard Roe1 in the Superior Court of Puerto



1. Paragraph 3 of Casas's complaint said:

-3-

Rico, San Juan Part. Casas alleged that (1) Mita had

deprived Casas of its exclusive distribution rights without

just cause in violation of P.R. Laws Ann. tit. 10, 278-

278d 91976) (referred to in the complaint and hereinafter as

"Law 75"), (2) defendants had conspired to deprive Casas of

its right to sell and distribute Mita products, (3) Mita had

impaired Casas's exclusive distribution agreement, and (4)

defendants had intentionally interfered with Casas's

contractual relationship with Mita. Casas sought preliminary

and permanent injunctive relief, as well as monetary damages.

Alleging the existence of diversity jurisdiction,

Mita removed the action to the United States District court

for the District of Puerto Rico on March 6, 1991.

Thereafter, Casas amended its complaint twice. An amendment



Codefendants John Doe and Richard Roe are
fictitious names used to refer to
defendants whose names are unknown at
present. Said defendants are the natural
persons and/or corporate and/or judicial
entities who together with MITA have
conspired, with knowledge of the
contractual relationship between MITA and
Casas, to deprive the latter of said
contractual relationship, directly and
indirectly interfering therewith, causing
the damages hereinafter itemized. To
plaintiff's best knowledge and
understanding, John Doe and Richard Roe
are citizens and residents of the
Commonwealth of Puerto Rico and are also
liable to plaintiff pursuant to the
allegations mentioned hereinafter.

(emphasis added).

-4-

filed on March 9, 1992, added a fifth count,2 and eliminated

Casas's request for a preliminary (but not a permanent)

injunction. By a second motion to amend, brought on May 14,

1992, Casas sought to replace the fictitious defendants with

Caguas Copy, Inc. ("Caguas") and Oficentro J.P., Inc.

("Oficentro") the corporations that Mita had designated as

new distributors in the Greater San Juan area upon

terminating Casas's exclusive distribution rights. Paragraph

3 of Casas's Second Amended Complaint read:

Codefendants Caguas Copy, Inc. and
Oficentro J.P., Inc. are, upon
information and belief, corporate
entities organized pursuant to the laws
of the Commonwealth of Puerto Rico, with
Principal offices located at Suite B-3,
Goyco Street # 10, Caguas, P.R., and
Diamante Street # 24, Villa Blanca,
Caguas, P.R., respectively. Said
defendants are the corporate and/or
judicial entities who together with MITA
have conspired, with knowledge of the
contractual relationship between MITA and
Casas, to deprive the latter of said
contractual relationship, directly and
indirectly interfering therewith, causing
the damages hereinafter itemized. To
plaintiff's best knowledge and
understanding, Caguas Copy, Inc. and
Oficentro J.P., Inc. are citizens and
residents of the Commonwealth of Puerto
Rico and are also liable to plaintiff
pursuant to the allegations mentioned
hereinafter.



2. Count Five alleged that defendants had illicitly and
tortiously contracted for the distribution of Mita products
in Puerto Rican territories in which Mita had granted Casas
the exclusive right to distribute its products.

-5-

(emphasis added). Four days later, on May 18, 1992, Casas

moved the district court for an expedited review of its

second motion to amend its complaint. Such review was

necessary, said Casas, because Oficentro was under the

protection of the United States Bankruptcy Court for the

District of Puerto Rico which had ordered that all

creditors file their proof of claims on or before June 8,

1992 and Casas could not file a proof of claim until its

motion to amend was granted. The district court allowed

Casas's second amendment in early June 1992.

In the meantime, Mita had moved for summary

judgment on February 12, 1992. It argued primarily that (1)

Mita did not impair its contractual relationship with Casas

because it merely enforced its rights under the terms of the

1989 Agreement, (2) even if it were found that Mita impaired

its contractual relationship with Casas, Mita had just cause

to do so, and (3) Casas's suit was barred by the equitable

doctrine of laches. On March 16, 1992, Casas opposed Mita's

motion for summary judgment, and brought a cross-motion for

partial interlocutory summary judgment on its Law 75 claims

(Counts One and Three), renewing its request for a permanent

injunction.3 Mita, in turn, filed, on April 13, 1992, an



3. In its original complaint, Casas had requested the
district court to

issue a permanent injunction against
Mita, ordering it [(1)] to cease and

-6-

opposition to Casas's cross-motion for summary judgment in

which it maintained, inter alia, that (1) permanent

injunctive relief is not available under Law 75, and (2)

ordering permanent injunctive relief in this case would be

unconstitutional. Finally, in a separate motion, filed on

June 4, 1992, Mita sought to dismiss Casas's complaint on the

grounds that Casas had engaged in a fraud upon the court.

The United States magistrate judge reviewed Mita's

motions to dismiss and for summary judgment, as well as

Casas's cross-motion for summary judgment. In a report and

recommendation issued on September 2, 1993, the magistrate

judge concluded that (1) Casas had not committed fraud on the

court, (2) Casas was not barred by the doctrine of laches

from pursuing its claims under Law 75, (3) Mita did not have

just cause under Law 75 to terminate Casas's exclusive

distribution rights because it failed to demonstrate that the

quota provision in the 1989 Agreement was reasonable at the



desist from continuing with the acts
which constitute impairment of the terms
of the distribution relationship existing
between it and Casas, . . . [(2)] to
abstain from appointing, choosing,
designating or arranging for other
additional distributors and/or in
substitution of Casas[,] and . . . [(3)]
to abstain from terminating and/or
altering the distribution relationship
existing between both parties or
performing any act or omission whatsoever
in impairment thereof, all pursuant to
the provisions of Law 75.

-7-

time of Casas's nonperformance, (4) a permanent injunction

may be ordered under Law 75, and (5) Mita had impaired its

contractual relationship with Casas. Consequently, the

magistrate judge recommended that the district court deny

Mita's motions to dismiss and for summary judgment, and grant

Casas's cross-motion for summary judgment.

In its opinion and order filed on November 18,

1993, the district court adopted all of the magistrate

judge's recommendations, thereby granting Casas's cross-

motion for summary judgment on its Law 75 claims (Counts One

and Three).4 Casas Office Machines v. Mita Copystar

Machines, 847 F. Supp. 981, 983 (D.P.R. 1993). In a judgment

entered the same day, the district court denied Mita's

motions to dismiss and for summary judgment, and granted

Casas's motion for an injunction permanently enjoining Mita

from impairing the 1989 Agreement without just cause.5

Mita, pursuant to 28 U.S.C. 1292(a)(1) (1988),6 appeals



4. The district court did not decide Counts Two, Four, and
Five of Casas's complaint, and, to our knowledge, they remain
unresolved.

5. The district court emphasized in its opinion and order
that it was not placing Mita in involuntary servitude.
According to the district court, Mita could impair its
contractual relationship with Casas in the future if it could
demonstrate just cause for doing so.

6. Section 1292(a)(1) provides in relevant part:

[T]he courts of appeals shall have
jurisdiction of appeals from:

-8-

from this interlocutory decision. Mita argues principally:

(1) that diversity jurisdiction was defeated when Caguas and

Oficentro were substituted for the fictitious defendants; (2)

that the district court improperly entered summary judgment;

and (3) that the district court improperly issued a permanent

injunction.

II.

Before we reach the issue of subject matter

jurisdiction, we respond to Casas's challenge to our

appellate jurisdiction. Casas maintains that, under Carson

v. American Brands, Inc., 450 U.S. 79, 101 S. Ct. 993, 67 L.

Ed. 2d 59 (1981), jurisdiction under 1292(a)(1) does not

exist unless the appellant demonstrates that the district

court's interlocutory order "might have a serious, perhaps

irreparable, consequence, and that the order can be

effectually challenged only by immediate appeal." 450 U.S.

at 84 (internal quotations omitted). According to Casas,

Mita has failed to satisfy these requirements. Casas's

argument is not well taken.



(1) Interlocutory orders of
the district courts of the
United States . . ., or of the
judges thereof, granting,
continuing, modifying, refusing
or dissolving injunctions, or
refusing to dissolve or modify
injunctions, except where a
direct review may be had in the
Supreme Court.

-9-

The Supreme Court has said that 1292(a)(1)

provides appellate jurisdiction over two types of orders:

those "that grant or deny injunctions and [those] that have

the practical effect of granting or denying injunctions and

have `serious, perhaps irreparable, consequence[s].'"

Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271,

287-88, 108 S. Ct. 1133, 99 L. Ed. 2d 296 (1988) (quoting

Carson, 450 U.S. at 84). Thus, courts of appeals, in

determining whether they have appellate jurisdiction under

1292(a)(1), must, in the first instance, decide "`whether the

order appealed from specifically [granted or] denied an

injunction or merely had the practical effect of doing so.'"

Morgenstern v. Wilson, 29 F.3d 1291, 1294 (8th Cir. 1994)

(quoting Kausler v. Campey, 989 F.2d 296, 298 (8th Cir.

1993)). If the interlocutory order in question "expressly

grants or denies a request for injunctive relief, the Carson

requirements need not be met and the order is immediately

appealable as of right under 1292(a)(1)." Morgenstern, 29

F.3d at 1294-95 (observing that the majority of the circuits

agree with this principle, and citing cases); see Feinstein

v. Space Ventures, Inc., 989 F.2d 49, 49 n.1 (1st Cir. 1993)

(accepting appellate jurisdiction under 1292(a)(1), and

noting the distinction between "an interlocutory order which

has the incidental effect of denying [or granting] injunctive

relief" and an order that "clearly and directly grant[s] a[n]

-10-

. . . injunction"). On the other hand, "if an order merely

has the practical effect of granting or denying an

injunction, the Carson . . . test[s] must be satisfied."

Morgenstern, 29 F.3d at 1295.

Here, the district court's order expressly granted

Casas's motion for an injunction barring Mita from impairing

the 1989 Agreement without just cause. Casas, 847 F. Supp.

at 990. Accordingly, for the reasons discussed, the district

court's order was immediately appealable as of right, and

Mita was not required to satisfy the Carson criteria. Thus,

we have appellate jurisdiction. We now consider our subject

matter jurisdiction.

III.

Mita argues that there is no subject matter

jurisdiction in federal court because complete diversity of

citizenship was destroyed when the fictitious defendants were

replaced with Caguas and Oficentro after removal. Although

Mita raises this issue for the first time on appeal, we are

obliged to address it because a defense of lack of

jurisdiction over the subject matter is expressly preserved

against waiver by Fed. R. Civ. P. 12(h)(3). E.g., Halleran

v. Hoffman, 966 F.2d 45, 47 (1st Cir. 1992). Casas responds

that, diversity jurisdiction, once established at the time of

removal, could not be lost by replacement of the fictitious

defendants with Caguas and Oficentro, which Casas describes

-11-

as nondiverse, dispensable parties. Alternatively, if

jurisdiction was indeed defeated by the substitution of

Caguas and Oficentro after removal, Casas asks us to restore

it, nunc pro tunc, by dismissing the diversity-spoiling

defendants without prejudice.

A.

This case involves no federal question.

Jurisdiction stands or falls upon diversity of citizenship.

It has long been settled that a "lack of `complete diversity'

between the parties deprives the federal courts of

jurisdiction over the lawsuit." Sweeney v. Westvaco Co., 926

F.2d 29, 41 (1st Cir.) (citing Strawbridge v. Curtiss, 7 U.S.

(3 Cranch) 267, 2 L. Ed. 435 (1806)), cert. denied, 112 S.

Ct. 274, 116 L. Ed. 2d 226 (1991). There was complete

diversity between the parties on March 6, 1991, when Mita

removed the case to federal court: Casas is a Puerto Rico

corporation, and Mita was incorporated in California and

maintains its principal place of business in New Jersey.

That the fictitious defendants, John Doe and Richard Roe,

might reside in Puerto Rico as suggested by Casas in the

original complaint was properly disregarded under 28

U.S.C. 1441(a) (1988), which provides in relevant part:

"For purposes of removal . . ., the citizenship of defendants

sued under fictitious names shall be disregarded." After

removal, however, Casas replaced the fictitious defendants

-12-

with Caguas and Oficentro, which were clearly identified as

Puerto Rico corporations, like Casas itself. The issue is

whether this substitution, which unquestionably destroyed

complete diversity, also defeated federal subject matter

jurisdiction. We hold that it did.

Casas argues that as diversity jurisdiction was

established at the commencement of the proceeding, it was not

later defeated by the mere naming of the fictitious parties,

who were dispensable, not indispensable. E.g., Freeport-

McMoRan Inc. v. K N Energy, Inc., 498 U.S. 426, 428, 111 S.

Ct. 858, 112 L. Ed. 2d 951 (1991) (per curiam) (holding that,

because there was complete diversity when the action

commenced, diversity jurisdiction was not defeated by the

addition of a nondiverse plaintiff, which was not

indispensable); Wichita R.R. & Light Co. v. Public Util.

Comm'n, 260 U.S. 48, 54, 43 S. Ct. 51, 67 L. Ed. 124 (1922).

Under the general principle reflected in the above cases, the

existence of federal jurisdiction here might seem to depend

simply upon whether Caguas and Oficentro were dispensable or

indispensable parties. But "[f]ederal courts are courts of

limited jurisdiction, and . . . may exercise only the

authority granted to them by Congress." Commonwealth of

Mass. v. Andrus, 594 F.2d 872, 887 (1st Cir. 1979); e.g.,

Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374, 98

S. Ct. 2396, 57 L. Ed. 2d 274 (1978) ("The limits upon

-13-

federal jurisdiction, whether imposed by the Constitution or

by Congress, must be neither disregarded nor evaded.").

Thus, specific legislative directives override the general

principles announced in these cases, e.g., 28 U.S.C. 

1367(b) (Supp. V 1993) (supplemental jurisdiction).7 Here,

as we explain below, Congress has indicated that federal

diversity jurisdiction is defeated so long as, after removal,

fictitious defendants are replaced with nondiverse, named

defendants, regardless of whether they happen to be

dispensable or indispensable to the action.

As part of the Judicial Improvements and Access to

Justice Act of 1988, Pub. L. No. 100-702, 102 Stat. 4669

(1988), Congress enacted 28 U.S.C. 1447(e) (1988), which

provides:

If after removal the plaintiff seeks
to join additional defendants whose
joinder would destroy subject matter
jurisdiction, the court may deny joinder,



7. Under 28 U.S.C. 1367(b), for instance, federal courts,
sitting in diversity, "shall not have supplemental
jurisdiction . . . over claims by plaintiffs against persons
made parties under Rule 14, 19, 20, or 24 of the Federal
Rules of Civil Procedure . . . when exercising supplemental
jurisdiction over such claims would be inconsistent with the
jurisdictional requirements of section 1332." This statute,
which refers expressly to both compulsory and permissive
joinder, "does not allow joinder of additional parties if to
do so would defeat the rule of complete diversity." Charles
A. Wright, Law of Federal Courts 9, at 38 (1994). Thus,
where Congress has specifically so provided, the addition of
nondiverse, dispensable parties will defeat diversity
jurisdiction, even if such jurisdiction has already been
established at the start of the federal proceeding.

-14-

or permit joinder and remand the action
to the State court.

Although this provision relates expressly to joinder, the

legislative history to the Judicial Improvements and Access

to Justice Act of 1988 indicates that 1447(e) applies also

to the identification of fictitious defendants after removal.

H.R. Rep. No. 889, 100th Cong., 2d Sess. 72-73 (1988),

reprinted in 1988 U.S.C.C.A.N. 5982, 6033 ("Th[e] provision

also helps to identify the consequences that may follow

removal of a case with unidentified fictitious defendants.");

e.g., Lisa Combs Foster, Note, Section 1447(e)'s

Discretionary Joinder and Remand: Speedy Justice or Docket

Clearing?, 1990 Duke L.J. 118, 121, 132 ("[I]f after removal

the plaintiff identifies the Doe defendant as a nondiverse

party, then pursuant to section 1447(e) the court may either

deny joinder or permit joinder and remand.").

Federal courts and commentators have concluded

that, under 1447(e), the joinder or substitution of

nondiverse defendants after removal destroys diversity

jurisdiction, regardless whether such defendants are

dispensable or indispensable to the action. E.g., Yniques v.

Cabral, 985 F.2d 1031, 1034 (9th Cir. 1993); Washington

Suburban Sanitary Comm'n v. CRS/Sirrine, Inc., 917 F.2d 834,

835 (4th Cir. 1990); Rodriguez by Rodriguez v. Abbott Lab.,

151 F.R.D. 529, 533 n.6 (S.D.N.Y. 1993); Vasilakos v.

Corometrics Medical Sys., Inc., No. 93-C-5343, 1993 WL

-15-

390283, at *1-2 (N.D. Ill. 1993); Righetti v. Shell Oil Co.,

711 F. Supp. 531, 535 (N.D. Cal. 1989); David D. Siegel,

Commentary on 1988 and 1990 Revisions of Section 1441, in 28

U.S.C.A. 1441 (1994) (observing that when a plaintiff moves

to substitute a nondiverse, named defendant for a fictitious

defendant, "the plaintiff will meet the new subdivision (e)

of 1447, which leaves it entirely to the court to determine

whether to refuse the addition and keep the case or allow the

addition and then remand the case for want of federal

jurisdiction (caused by the loss of diversity)"); Foster,

Note, supra, at 121 ("Significantly, section 1447(e) does not

require the court, in considering whether joinder of a

nondiverse party should be permitted to deprive the court of

jurisdiction, to determine whether the party is

`indispensable' to the action according to Federal Rule

19(b). Unlike the approach under the Federal Rules, joinder

of a non-indispensable party can deprive the court of

jurisdiction."). We find these decisions persuasive. We

conclude that diversity jurisdiction was lost in the present

case when the court allowed Casas to identify the fictitious

defendants as Caguas and Oficentro.

Section 1447(e)'s legislative history supports this

conclusion. In enacting 1447(e), Congress considered a

proposal that would have allowed the joinder of certain

nondiverse parties and, at the same time, permitted the

-16-

district court, in its discretion, to keep the case and

decide it on the merits. H.R. Rep. No. 889, 100th Cong., 2d

Sess. 72-73 (1988), reprinted in 1988 U.S.C.C.A.N. 5982,

6033-34 ("The most obvious alternative [to 1447(e)] would

be to provide that `the court may deny joinder, dismiss the

action, or permit joinder and either remand to the state

court or retain jurisdiction.'"); see David D. Siegel,

Commentary on 1988 Revision of Section 1447, in 28 U.S.C.A. 

1447 (1994); Foster, Note, supra, at 137-38. Congress

rejected the proposal, however, because it would have

represented a "departure from the traditional requirement of

complete diversity," and "provide[d] a small enlargement of

diversity jurisdiction." H.R. Rep. No. 889, 100th Cong., 2d

Sess. 72-73 (1988), reprinted in 1988 U.S.C.C.A.N. 5982,

6033-34. We think that, had Congress decided that federal

courts could retain jurisdiction over cases in which

plaintiffs joined or substituted dispensable, nondiverse

defendants after removal, it would have made that plain in

1447(e).

This is not to say that it is unimportant whether a

nondiverse defendant whom a plaintiff seeks to join or

substitute after removal is dispensable or indispensable to

the action. If the defendant is indispensable, the district

court's choices are limited to denying joinder and dismissing

the action pursuant to Fed. R. Civ. P. 19, or else allowing

-17-

joinder and remanding the case to the state court pursuant to

1447(e). See Yniques, 985 F.2d at 1035. If, on the other

hand, the defendant is dispensable, the district court has

the options, pursuant to 1447(e), of denying joinder and

continuing its jurisdiction over the case, or permitting

joinder and remanding the case to state court.8 Id. A

district court may not, however, do what the court below did

here, that is, substitute the nondiverse, named defendants

for the fictitious defendants thereby defeating federal

diversity jurisdiction and then continue to deal with the

merits of the dispute.

B.

Although diversity jurisdiction was defeated when

Caguas and Oficentro were substituted for the fictitious

defendants after removal, jurisdiction could be restored

retroactively in appropriate circumstances, if Caguas and

Oficentro were dispensable parties, by dismissing them from

the action. In Newman-Green, Inc. v. Alfonzo-Larrain, 490

U.S. 826 109 S. Ct. 2218, 104 L. Ed. 2d 893 (1989), the

Supreme Court held that federal courts of appeals have the

authority like that given to the district courts in Fed.



8. "[A] district court, when confronted with an amendment to
add a nondiverse nonindispensable party, should use its
discretion in deciding whether to allow that party to be
added." Hensgens v. Deere & Co., 833 F.2d 1179, 1182 (5th
Cir. 1987) (describing factors that district courts may
consider in deciding whether or not to permit the addition of
dispensable, nondiverse parties).

-18-

R. Civ. P. 21 to dismiss dispensable, nondiverse parties

to cure defects in diversity jurisdiction. 490 U.S. at 832-

38. Casas asks us to exercise this power here by dismissing

Caguas and Oficentro without prejudice. 

Courts may not, of course, dismiss indispensable

parties from an action in order to preserve federal

jurisdiction. But, contrary to Mita's assertions, we

conclude that Caguas and Oficentro are dispensable parties.

Mita's principal contention is that Casas is barred by the

doctrine of judicial estoppel from asserting that Caguas and

Oficentro are dispensable parties because Casas, in a motion

requesting relief from the automatic stay, represented to the

United States Bankruptcy Court for the District of Puerto

Rico that Oficentro is an indispensable party. In that

motion, Casas argued in the bankruptcy court that:

2. Creditor CASAS wishes to duly
serve process, litigate and try the above
mentioned lawsuit in the U.S. District
Court against Debtor [(Oficentro)], and
the other defendants [(Mita and Caguas)]
before a jury. If CASAS is not allowed
to serve process and litigate its claims
against Debtor, CASAS would be
effectively precluded from obtaining
recovery under its tortious interference
and contract in prejudice of third
party's claims, due to a lack of an
indispensable party. Concomitantly,
CASAS' constitutional right to have a
trial by jury on all its legally tenable
claims would be impaired.

(emphasis added).

-19-

While this assertion is manifestly at odds with

Casas's present position, we are disinclined under all the

circumstances to find that it created an estoppel. Judicial

estoppel is a judge-made doctrine designed to prevent a party

who plays "fast and loose with the courts" from gaining

unfair advantage through the deliberate adoption of

inconsistent positions in successive suits. See Scarano v.

Central R.R. Co., 203 F.2d 510, 513 (3d Cir. 1953). Here, it

does not appear that Casas succeeded in gaining any advantage

as a result of its earlier inconsistent statement made to the

bankruptcy court. While the court granted Casas's motion to

lift the stay, it did so on grounds other than Casas's

representation that Caguas and Oficentro were indispensable.

Mita itself does not allege that it relied on or was

prejudiced by the statement in any way. There is the further

fact that Mita has played as "fast and loose" as has Casas

with the issue of subject matter jurisdiction. It was Mita

the party now seeking remand to the Commonwealth courts

that removed the case here. After the fictitious parties

were identified, it made no effort to remand. Only after the

district court ruled against it did Mita decide that federal

jurisdiction was a mistake. We conclude that Casas is not

estopped from taking the position it adopts now. See Milgard

Tempering, Inc. v. Selas Corp., 902 F.2d 703, 716-17 (9th

-20-

Cir. 1990); 18 Charles Wright et al., Federal Practice and

Procedure 4477, at 781 (Supp. 1994).9 

Mita next argues that Caguas and Oficentro are

indispensable parties under a Federal Rules of Civil

Procedure 19(b) analysis. It submits that, because the

permanent injunction compels it to resume an exclusive

distribution relationship with Casas in the Greater San Juan

area, Caguas's and Oficentro's contractual rights to

distribute Mita products in that area are necessarily

canceled. Moreover, Mita points out that Casas is seeking a

declaratory judgment decreeing Mita's distribution agreements

with Caguas and Oficentro null and void. Under these

circumstances, says Mita, this action cannot "in equity and

good conscience" proceed without Caguas and Oficentro, which

are entitled to protect their contractual interests. We are

not persuaded. A leading commentator writes:

When a person is not a party to the
contract in litigation and has no rights
or obligations under that contract, even
though he may have obligated himself to
abide by the result of the pending action
by another contract that is not at issue,
he will not be regarded as an
indispensable party in a suit to
determine obligations under the disputed



9. We agree with Casas that International Travelers Cheque
Co. v. Bankamerica Corp., 660 F.2d 215, 223-24 (7th Cir.
1981) is distinguishable. In that case, the district court
had expressly relied on plaintiff's previous statement that a
party was indispensable. There was no such reliance in this
case.

-21-

contract, although he may be a Rule 19(a)
party to be joined if feasible.

7 Charles A. Wright et al., Federal Practice and Procedure 

1613, at 199-200 (1986) (footnotes omitted) (citing cases);

see Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,

968 F.2d 1463, 1472 (1st Cir. 1992) ("`[I]t is generally

recognized that a person does not become indispensable to an

action to determine rights under a contract simply because

that person's rights or obligations under an entirely

separate contract will be affected by the result of the

action.'" (quoting Helzberg's Diamond Shops, Inc. v. Valley

West Des Moines Shopping Ctr., Inc., 564 F.2d 816, 820 (8th

Cir. 1977) (explaining the rationale for the rule))). The

present case fits within this principle. As to Casas's

request for declaratory judgment, Casas, in its appellate

brief, "voluntarily relinquishes its request for a

declaratory judgment seeking the annulment of [Caguas's] and

[Oficentro's] dealership agreements."

Although the only claims before us on appeal are

those alleging violation of Law 75, we note that Caguas and

Oficentro are similarly dispensable parties with respect to

the remaining claims. In each of the remaining claims, the

defendants are alleged to be joint tortfeasors or co-

conspirators and are thus jointly and severally liable. It

is well-established that joint tortfeasors and co-

conspirators are generally not indispensable parties. See

-22-

Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit

Int'l, 982 F.2d 686, 691 (1st Cir. 1993); 7 Charles Wright et

al., Federal Practice and Procedure 1623, at 346-47 (2d ed.

1986) ("[C]o-conspirators, like other joint tortfeasors, will

not be deemed indispensable parties.")

That Caguas and Oficentro are dispensable to this

action does not, in and of itself, compel their dismissal.

While the Supreme Court held in Newman-Green that "the courts

of appeals have the authority to dismiss a dispensable

nondiverse party," 490 U.S. at 837, it "emphasize[d] that

such authority should be exercised sparingly," id. The Court

explained: "the appellate court should carefully consider

whether the dismissal of a nondiverse party will prejudice

any of the parties in the litigation. It may be that the

presence of the nondiverse party produced a tactical

advantage for one party or another." Id. at 838. In this

context, Mita argues that Casas gained a tactical advantage

by Caguas's and Oficentro's presence in the case because

Casas was able to obtain financial and business records under

Federal Rules of Civil Procedure 33(a) and 34(a), which apply

expressly to parties. We do not agree, however, with Mita's

suggestion that these records would have been beyond Casas's

reach had Caguas and Oficentro not been designated as

parties. Under Fed. R. Civ. P. 34(c), "A person not a party

to the action may be compelled to produce documents and

-23-

things or to submit to an inspection as provided in Rule

45."10

Thus, neither Casas nor Mita gained a significant

tactical advantage by the presence of Caguas and Oficentro in

the lawsuit. Nevertheless, we are concerned that Caguas and

Oficentro could themselves face prejudice if dismissed from

this suit. Caguas and Oficentro, while initially

characterized as John Doe and Richard Roe, were contemplated

as parties to this litigation from the start, and have

actively participated in it since June of 1992, when they

were substituted for the fictitious defendants. Had the

jurisdictional defect been called to the district court's

attention at that point, the district court would have either

dismissed Caguas and Oficentro from this action, thereby

requiring Casas to sue them separately in the commonwealth

court, or joined them to this action, thereby remanding the

entire case to the commonwealth court. Either way, Caguas

and Oficentro would have had their liability determined in a

single proceeding. Instead, because of the jurisdictional

oversight, dismissal of Caguas and Oficentro at this stage

could subject them to a new lawsuit before a new judge in the

Superior Court of Puerto Rico.



10. Mita baldly asserts that Casas could not have secured
under Rule 45 the documents and information it obtained under
Rules 33 and 34. Mita fails, however, to explain why this
would be so.

-24-

In Newman-Green, there was a similar difficulty.

The problem there was remedied by terminating the litigation

against the dismissed defendant with prejudice. 490 U.S. at

838. A similar remedy may be appropriate in this case. We

note, however, that Newman-Green presents a stronger case

than this one for dismissing the nondiverse party with

prejudice, since the nondiverse party in that case had

already had its claim adjudicated by the district court.

Here, by contrast, Caguas and Oficentro have not yet had

their claims adjudicated by the district court. Since this

case is closer than the case in Newman-Green and since this

issue has not been argued by either party, we think it best

to allow it to be decided initially by the district court, on

remand, where the parties will have an opportunity to present

their arguments.

Accordingly, we dismiss Caguas and Oficentro from

this action to preserve jurisdiction but direct the district

court, on remand, to determine whether the injury to Caguas

and Oficentro from being dismissed from this proceeding is

such that their dismissal should be ordered to be with

prejudice to any further suit by Casas. Caguas and Oficentro

having been dismissed, complete diversity is restored per

Newman-Green, and we retain subject matter jurisdiction over

the claims between Casas and Mita.

IV.

-25-

Having disposed of the jurisdictional issues, we

come to the merits of Mita's appeal. This appeal, of course,

is interlocutory, see note 6, supra, being taken solely from

the granting of the injunction against Mita. But the

injunction can stand only if the court properly awarded

summary judgment. We accordingly confront the merits of that

ruling.

On summary judgment, we review the district court's

decision de novo. Velez-Gomez v. SMA Life Assur., Co., 8

F.3d 873, 874-75 (1st Cir. 1993). A court of appeals will

uphold summary judgment only if the record, viewed in the

light most favorable to the nonmovant, reveals that there are

no genuine issues of material fact and that the movant is

entitled to judgment as a matter of law. Celotex Corp. v.

Catrett, 477 U.S. 317, 324-25, 106 S. Ct. 2548, 91 L. Ed. 2d

265 (1986).

Mita's primary argument is that genuine issues of

material fact preclude the granting of summary judgment to

Casas on its Law 75 claims. Specifically, Mita argues that

genuine issues exist as to: (1) whether Mita impaired its

contract with Casas and (2) whether Mita had "just cause" to

do so. To understand these arguments, we will need to step

back and take a look at the applicable law.

Law 75 protects Puerto Rico-based dealers from

summary cancellation of their dealership contracts by their

-26-

principal suppliers after the dealers have established a

favorable market for the principal's goods. See Warner

Lambert Co. v. Superior Court of Puerto Rico, 101 P.R. Dec.

378, 387 (1973), translated in, 1 Official Translations 527,

541 (1973). The stated purpose of the law is to protect

local dealers from abusive practices by suppliers who are

financially stronger than they are. See Medina & Medina v.

Country Pride Foods, Ltd., 88 J.T.S. 6162, 6168 (1988),

translated in, 858 F.2d 817, 820 (1st Cir. 1988). Toward

that end, Law 75 prohibits suppliers from taking any actions

that would impair such contracts, unless they have "just

cause" for doing so:

Notwithstanding the existence in a
dealer's contract of a clause reserving
to the parties the unilateral right to
terminate the existing relationship, no
principal or grantor may directly or
indirectly perform any act detrimental to
the established relationship or refuse to
renew said contract on its normal
expiration, except for just cause.

P.R. Laws Ann. tit. 10, 978a.

Law 75 establishes a rebuttable presumption of

impairment when a supplier appoints another dealer in

violation of its exclusive dealership agreement with its

original dealer:

For the purposes of this Act . . . it
shall be presumed, but for evidence to
the contrary, that a principal or grantor
has impaired the existing relationship .
. . when the principal or grantor
establishes a distribution relationship

-27-

with one or more additional dealers for
the area of Puerto Rico, or any part of
said area in conflict with the contract
existing between the parties.

P.R. Laws Ann. tit. 10, 278a-1(b)(2). The district court

adopted the magistrate's determination that this presumption

applied to Mita. Mita disputes this holding on appeal.

However, Mita did not dispute impairment before the district

court and, therefore, waived its right to make the argument

on appeal. Even without the presumption, moreover, Casas

presented ample evidence of impairment of the exclusive

dealership through Mita's appointment of Caguas and

Oficentro, evidence which Mita did not dispute. See, e.g.,

Draft-Line Corp. v. Hon Co., 781, 844 (D.P.R. 1991), aff'd,

983 F.2d 1046 (1st Cir. 1993); General Office Prods. Corp. v.

Gussco Mfg. Inc., 666 F. Supp. 328, 331 (D.P.R. 1987).

Accordingly, the only issue on appeal is whether there was

"just cause" for the impairment.

Law 75's "just cause" limitation applies even where

a contract includes a clause providing for termination under

specified circumstances. Because many such termination

clauses were tied to distribution quotas or goals, amendments

to Law 75 in 1988 clarified what "just cause" meant in the

context of contracts that contain such clauses:

The violation or nonperformance by the
dealer of any provision included in the
dealer's contract fixing rules of conduct
or distribution quotas or goals because
it does not adjust to the realities of

-28-

the Puerto Rican market at the time of
the violation or nonperformance by the
dealer shall not be deemed just cause.
The burden of proof to show the
reasonableness of the rule of conduct or
of the quota or goal fixed shall rest on
the principal or grantor.

P.R. Laws Ann. tit. 10, 278a-1(c)(1988). Thus failure to

meet a distribution quota will only constitute just cause for

impairment under Law 75 if that quota is shown to be

"reasonable" given the state of the Puerto Rican market at

the time of the alleged violation. See Newell Puerto Rico

Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 22-23 (1st Cir. 1994).

The contract between Mita and Casas granted Casas

an exclusive dealership in the greater San Juan area, so long

as Casas met 85% of a specific performance quota.11 Mita

terminated the exclusive dealership when, it alleges, Casas

failed to meet 85% of the quota. Under Law 75, however, Mita

could not impair its contract without just cause. Under the

above provisions of Law 75, Mita had "just cause" to

terminate the exclusivity provision only if the quota was

adjusted to the realities of the Puerto Rican market at the

time of Casas's failure to meet the quota. Moreover, Law 75



11. The quota called for Casas to sell 300 copiers and to
generate $450,000 in sales of such copiers during the first
13 months of the contract, between April 1, 1989 and April
30, 1990. Thus, to preserve the exclusivity provision, Casas
had to sell 255 copiers (85% of 300). If Casas fell below
255 copiers, it could still retain a nonexclusive dealership
unless its sales were 50% below quota, in which event Mita
could terminate any relationship whatsoever.

-29-

places on Mita's shoulders the burden of proving the

reasonableness of the quota. Thus, once Casas moved for

summary judgment and alleged an absence of evidence showing

that the quota provision was reasonable, Mita was required to

come forth with such evidence in order to survive summary

judgment. Celotex, 477 U.S. at 325 (Where the nonmovant has

the burden of proof, the movant need do no more than aver "an

absence of evidence to support the nonmoving party's case".);

Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993).

Mita contends that it submitted evidence sufficient

to raise a genuine issue of material fact as to the

reasonableness of the quota. It points to letters between

its counsel and Casas's counsel, and a declaration by

Masaharu Ishidoya, vice president of Mita's international

division, describing the negotiation of the quota.

Ishidoya's declaration indicated that Casas itself requested

that the exclusivity provision be conditioned upon a yearly

performance goal. At his deposition, Ishidoya indicated that

the 300 copier quota in the contract was a negotiated

reduction from a quota of 500 copiers first proposed by Mita.

The 1989 contract contained express language in which Casas

"acknowledges that the annual quotas . . . adjust to the

realities of the market" in Puerto Rico. Ishidoya states in

his declaration that he relied upon Casas's representations

to that effect. Mita also submitted a copy of the letter it

-30-

sent to Casas, terminating the exclusive dealership with

Casas. In that letter, Mita stated it was terminating the

exclusivity provision in the contract because Casas had

failed to meet the quota percentages set forth in the

contract.

Mita further submitted the declaration of Rafael

Martinez Margarida, the Managing Partner and Partner-in-

Charge of Management Consulting Services at Price Waterhouse.

Mita retained Martinez as an expert witness to testify as to

the reasonableness of the contract quota. In his

declaration, Martinez stated that he examined Puerto Rico's

External Trade Statistics ("PRETS") for imports of copy

machines to Puerto Rico for the period of 1985-1990. The

declaration included the following table:

YEAR QTY. IMPORTED VALUE GROWTH OVER PRIOR YEAR

1985 3,054 3,427,143 N/A
1986 4,170 6,058,273 77%
1987 7,375 8,103,991 34%
1988 6,026 8,148,662 1%
1989 7,056 9,259,856 14%
1990 8,983 10,032,200 8%

Martinez noted that the value of imports increased every year

between 1985 and 1990. Martinez also noted that the quota in

the contract was a projection based on Casas's actual sales

figures in 1985 (279 units), 1986 (153 units) and 1987 (230

units). Finally, Martinez noted that Casas's sales for 1989

(80 units) and 1990 (110 units) decreased significantly,

while the overall number of imports increased during that

-31-

same period. Martinez concluded that the quota was

reasonable given the historical trend, that Casas "failed to

capitalize on the opportunities available in a growing

market," and that its failure to meet the quota "cannot be

attributable to the conditions of the Puerto Rico market for

photocopying machines."

Casas points to various alleged flaws in Martinez's

methodology, and argues that these flaws require that his

declaration be completely excluded as unprobative and

incompetent. Casas argues that, in failing to deduct from

the import figures the number of copiers exported from Puerto

Rico, Martinez based his conclusions on an inaccurate picture

of the internal copier market. Casas also argues that these

same import figures include imports of all categories of

copiers, not just the categories of copiers that Casas sold

as part of its exclusive dealership agreement, and thus do

not accurately reflect the precise market in which Casas was

operating.12 Casas also argues that the quota, although

based on historical sales figures, unreasonably required



12. Casas also argues that the yearly data was irrelevant,
since Mita must provide evidence about the market on or about
May 1990, when the contract was terminated. This is plainly
wrong. Law 75 requires Mita to prove the reasonableness of
the quota "at the time of the violation or nonperformance by
the dealer." P.R. Laws Ann. tit. 10, 278a-1(c). Casas's
alleged nonperformance occurred during the period between
April 1989 and May 1990. Under the plain terms of Law 75, it
is the condition of the market during that period that is
relevant, not the condition of the market at the precise
point of the contract's impairment by the supplier.

-32-

Casas to double its market share in 13 months. Finally,

Casas argues that Martinez failed to consider various

relevant factors in his analysis, including the effect of

increased intrabrand competition, changes in the number of

dealers in the market, the effect of Hurricane Hugo, and the

impact of the local economic recession. Accordingly, Casas

argues, Martinez's declaration must be excluded, and Mita's

remaining evidence is insufficient to raise a genuine issue

of fact.

The district court found that Mita had failed to

present evidence sufficient to raise a genuine issue as to

the reasonableness of the quota. The court stated:

The magistrate found, and we agree,
that the quota provision was unreasonable
at the time of Casas' nonperformance. In
support of its claim that the quota was
reasonable, Mita presented an unsworn13
declaration by Rafael Martinez Margarida,
a certified public accountant (CPA). In
this declaration the CPA asserted that
his examination of the Puerto Rico
External Trade's [sic] Statistics (PRETS)
reflected a growing market for
photocopying machine imports from the
period of 1985 to 1990, inclusive. Thus,
he concluded, Casas' failure to meet the
quota could not be attributed to market
conditions.
As the magistrate found, Casas proved
that Mita's argument was based on
erroneous statistics. Among the factors
cited by the magistrate which we find
most convincing, the CPA's report failed
to take into account essential aspects of



13. The unsworn declaration was made under pain and
penalties of perjury. 28 U.S.C. 1746.

-33-

the Puerto Rican market such as the
effects of Hurricane Hugo and the
recession on the economy. The CPA's
report also failed to take into account
the effect of intrabrand rivalry on
Casas's market share, a rivalry fostered
by Mita's impairment of Casas' exclusive
distributorship.
Additionally, Mita's data as to the
market for copying machines in Puerto
Rico erroneously included types of
copying apparatus that were not machines
manufactured by Mita and sold to Casas.
Thus, Mita's evidence exaggerated the
size of the market by including within it
devices such as thermocopying mechanisms,
which were not among those apparatuses
made and sold to Casas by Mita, and
minimized market conditions by failing to
include negative factors such as
Hurricane Hugo, the recession, the
intrabrand rivalry etc. Clearly, Mita's
evidence fails to create a sufficient
question to prevent the entry of summary
judgment in Casas' favor since Mita has
the burden of proving that the quota's
[sic] were reasonable at the time of
Casas' nonperformance, given the legal
presumption that they were not
unreasonable.
Thus, it was "unreliable, lacked
probative value, and does not constitute
competent evidence." [Citing Magistrate's
Report.] Mita claims now that its
failure to submit more probative evidence
was due to its lack of time in which to
gather and present it. We find this
excuse pathetic and unconvincing.

Casas, 847 F. Supp. at 988-89. Mita argues that,

in granting summary judgment to Casas, the district court

exceeded its authority by improperly weighing the conflicting

evidence, supra, and deciding an issue of material fact,

notably, that the quota provision was unreasonable at the

time of Casas's nonperformance. In particular, Mita claims

-34-

that the district court improperly discredited Martinez's

testimony and that this constituted error since

determinations of credibility and how much weight to accord

testimony cannot be made at summary judgment and must be left

to the fact finder at trial. See Greenburg v. Puerto Rico

Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

Casas responds that the district court did not

weigh Martinez's declaration, but instead properly excluded

it under Fed. R. Civ. P. 56(e)14. Under Rule 56(e),

affidavits supporting or opposing summary judgment must set

forth facts that would be admissible in evidence. A district

court may exclude expert testimony where it finds that the

testimony has no foundation or rests on obviously incorrect

assumptions or speculative evidence. Quinones-Pacheco v.

American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992)

(excluding expert opinion where based on flawed assumptions);

Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666, 673 (D.C.

Cir. 1977) (excluding expert testimony for failure to

consider important factors). Such decisions are reviewed for



14. Fed. R. Civ. P. 56(e) provides:

Supporting and opposing affidavits shall
be made on personal knowledge, shall set
forth such facts as would be admissible
in evidence, and shall show affirmatively
that the affiant is competent to testify
to the matters stated therein.

Fed. R. Civ. P. 56(e).

-35-

abuse of discretion. Quinones-Pacheco, 979 F.2d at 6. Casas

argues that the district court properly excluded Martinez's

declaration as based on flawed data and, faced with a lack of

evidence as to the reasonableness of the quota, properly

entered summary judgment in its favor.

A. Martinez's Declaration was not Excludable

It is not clear that the district court meant to

treat Martinez's declaration as excludable under Fed. R. Civ.

P. 56(e). The court nowhere articulated such a ruling. But

if we assume the court meant to exclude the declaration as

incompetent for summary judgment purposes, we think it went

too far. We may accept that Martinez's opinion, standing

alone, was worth little more than the inferences a fact

finder might reasonably draw from the factual data stated in

his declaration. Martinez was not said to have had some

special familiarity with, or expertise in, the Puerto Rico

copier market, apart from the data he presented and sought to

interpret. However, that data, including the PRETS and

Casas's past sales figures, was admissible and, examined in a

light most favorable to Mita, tends to support Martinez's

conclusion that the quota was reasonable. We see no basis

under Fed. R. Civ. P. 56(e) for excluding the entire

declaration altogether.

Under Rule 56(e), an affidavit must meet three

requirements. It:

-36-

[1] shall be made on personal knowledge,
[2] shall set forth such facts as would
be admissible in evidence, and [3] shall
show affirmatively that the affiant is
competent to testify to the matters
stated therein.

Fed. R. Civ. P. 56(e). Unless a party moves to strike an

affidavit under Rule 56(e), any objections are deemed waived

and a court may consider the affidavit. See Davis v. Sears,

Roebuck & Co., 708 F.2d 862, 864 (1st Cir. 1983). The moving

party must specify the objectionable portions of the

affidavit and the specific grounds for objection. See 10A

Charles Wright et al., Federal Practice & Procedure 2738 at

507 (2d ed. 1983). Furthermore, a court will disregard only

those portions of an affidavit that are inadmissible and

consider the rest of it. See Lee v. National Life Assur.,

632 F.2d 524 (5th Cir. 1980) ("Where the affidavit includes

both competent and incompetent evidence, the Court should

disregard the incompetent evidence, but give full

consideration to that which is competent. . . . This is

nothing more than the procedure which would be followed at

trial."); Wright, 2738 at 509.

In moving below to strike the Martinez deposition

under Rule 56(e), Casas made much the same arguments it now

makes on appeal. Casas did not argue under the first clause

in Rule 56(e) that Martinez lacked personal knowledge

sufficient to testify as to the PRETS and sales figures. Nor

did Casas argue under the third clause that Martinez was

-37-

incompetent to provide his expert interpretation of these.

Rather, Casas argued, under the second clause of Rule 56(e),

that the facts contained in the declaration were not

admissible in evidence because, in essence, they were simply

not sufficiently material to, and probative of, the

reasonableness of the quota.

The district court characterized the declaration as

containing "erroneous statistics." Casas, 847 F. Supp. at

988. But neither Casas nor the court asserted that the

figures in the declaration were not accurate reproductions of

Puerto Rico's External Trade Statistics, nor did they dispute

the correctness of the other data mentioned in the

declaration. The court's reason for calling the statistics

"erroneous" seems not to have been their inaccuracy as such

but rather its belief that they did not constitute an

accurate measure of the Puerto Rico copier market. The

district court also criticized the alleged failure of

Martinez's declaration to account for the impact of Hurricane

Hugo, the effect of the local recession, and the impact of

intrabrand rivalry, matters raised in Casas's materials.

But the increase in copier imports between 1989 and

1990, as reflected in the PRETS, implicitly rebutted Casas's

evidence that the hurricane and the local recession had had a

materially adverse effect on the Puerto Rican copier market.

In finding that the declaration failed to consider these

-38-

"essential aspects" of the market, the district court

overlooked the relevant inference that could be drawn from

the rise in copier imports shown in the PRETS figures.15

See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158, 90 S. Ct.

1598, 26 L. Ed 2d 142 (1970); Aponte-Santiago v. Lopez-

Rivera, 957 F.2d 40, 41 (1st Cir. 1992) (the court at summary

judgment "must view the evidence and all factual inferences

therefrom in the light most favorable to the non-moving

party").

Casas's argument that the PRETS and other data did

not account for the impact of intrabrand competition is more

troubling. See infra. While the PRETS figures suggest that

the market grew in spite of the hurricane and recession, they

indicate nothing directly about the possible impact of

increased intrabrand competition. However, it is one thing

to note this silence of the evidence, another to exclude the

PRETS figures because of it. Evidence may be relevant and

admissible even though, standing alone, it fails to address



15. The cases that Casas cites in its brief, Quinones-
Pacheco and Merit Motors, are distinguishable. In Quinones,
the expert testimony with respect to damages was based on an
assumption that was clearly unsupported by the record, namely
that the plaintiff was permanently disabled. 979 F.2d at 6.
Similarly, in Merit Motors, the expert testimony failed to
account for significant factors that were clearly relevant to
the issue at hand. 569 F.2d at 673. By contrast, in this
case, it remains open to debate whether Hurricane Hugo, the
recession, or intrabrand competition had an effect on the
Puerto Rico market, and what that effect was, if any. The
impact of these factors is precisely the issue to be
resolved.

-39-

every issue raised in a case. As noted below, Mita presented

other evidence that arguably bolsters its position that the

quota was reasonable. Given the unlikelihood of ever

unearthing irrefutable statistical evidence, we do not think

the PRETS and other statistics, and accompanying inferences,

were so weak that they should be rejected as material

evidence in this case.

The district court found that the PRETS figures

were also "erroneous" because they included other categories

of copying machines that were not the types of machines sold

by Casas. Casas, 847 F. Supp. at 988. Casas pointed to the

fact that the 1990 PRETS figure included imports of five

categories of copiers, while Casas sold copiers in only three

of these categories. This "exaggerated the size of the

market." The absolute size of the market was not, however,

the issue. Rather, the issue was the trend in the market,

i.e. whether the market was increasing or decreasing, whether

Casas's sales were consistent with the trend, and whether the

quota was consistent with Casas's historical market share.

Martinez explained in his deposition that it was necessary to

include the additional categories in the 1990 PRETS figures

in order to obtain comparable yearly data, since prior to

that year the data for the copier market had not been broken

up into the five subcategories. The inclusion of these

categories did not necessarily make his testimony about the

-40-

trend in the market any less probative. Casas did not attack

the comparability of the figures and failed to present

evidence suggesting that excluding the categories, if this

had indeed been possible, would have resulted in a different

trend.

We conclude that the reasons set forth by the

district court were insufficient bases for rejecting the

Martinez declaration altogether, assuming this was what the

court intended to do. Nor do we find Casas's additional

arguments sufficient for its outright exclusion. Casas

complains: that Martinez failed to deduct export figures from

the import figures in order to obtain a true measure of the

internal copier market; that Martinez failed to consider the

fact that the quota, according to Casas, required Casas to

double its market share within thirteen months; that Martinez

failed to consider the fact that during the period of the

contract, Casas had a smaller region of exclusive dealership

than before.

While these additional arguments are not without

force, a party may not exclude, on summary judgment, relevant

and otherwise admissible factual evidence solely on the

ground that the evidence leaves a number of unanswered

questions or that it appears somewhat less persuasive than

the movant's evidence offered in rebuttal. If there are

genuine issues of fact, the nonmovant is entitled to have

-41-

these resolved in the trial forum, where the fact finder

hears live witnesses and can better assess all the facts.

We conclude if the district court intended to do

so that it did not have sufficient grounds for excluding

Mita's declaration under Fed. R. Civ. P. 56(e).

B. Sufficiency of Mita's Evidence to Raise Issue of Fact

Having found no adequate basis to exclude from

consideration Martinez's declaration, we next consider

whether that declaration and Mita's other evidence were

sufficient to raise a genuine issue of fact as to the

reasonableness of the quota in light of the Puerto Rico

market.16

It is instructive first to review the summary

judgment standard. "By its very terms, this standard

provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment, the

requirement is that there is no genuine issue of material

fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-48

(1986). For a dispute to be "genuine," there must be

sufficient evidence to permit a reasonable trier of fact to



16. Casas does not address this issue on appeal. Casas's
only argument on appeal is that the district court properly
excluded the Martinez declaration. Although this could be
interpreted as a concession that summary judgment was
improper if the Martinez declaration was admissible, we
nevertheless proceed to address the key summary judgment
issue.

-42-

resolve the issue in the non-movant's favor. Boston Athletic

Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir. 1989); Astra

Pharmaceutical Prod., Inc. v. Beckman Instruments, Inc., 718

F.2d 1201, 1204 (1st Cir. 1983). The evidence cannot be

merely colorable, but must be sufficiently probative to show

differing versions of fact which justify a trial. However,

the evidence must at all times be viewed in the light most

favorable to the nonmovant, and all doubts and reasonable

inferences must be resolved in the nonmovant's favor.

Adickes 398 U.S. at 158; Rogen v. Ilikon Corp., 361 F.2d 260,

266 (1st Cir. 1966). Moreover, this court may not weigh the

evidence. Summary judgment "admit[s] of no room for

credibility determinations, no room for the measured weighing

of conflicting evidence such as the trial process entails

. . . ." Greenburg, 835 F.2d at 936. If the facts permit

more than one reasonable inference, the court on summary

judgmentmay notadopttheinferenceleastfavorabletothenonmovant.

Viewing Mita's evidence in its most favorable

light, we think that, although the question is close, Mita's

evidence and the reasonable inferences therefrom are

sufficient to raise a genuine issue as to the reasonableness

of the quota. First, the contract executed by the parties

contains a clause in which Casas expressly agreed that the

quota was reasonable in light of the realities of the Puerto

Rico market. We do not suggest that such a clause was

-43-

binding, since public policy would presumably not permit the

provisions of Law 75 to be contracted away.17 However, we

think Casas's express agreement in the contract that the

quota was reasonable is admissible evidence tending to

establish the reasonableness of the quota at the time Casas

signed the contract. Bolstering the weight of Casas's

concession were the letters from Mita's attorneys and

Ishidoya's testimony showing that Casas had been successful

in renegotiating the quota downward from 500 to 300 copiers.

Its ability to do so suggests a degree of parity in the

parties' bargaining positions, making it more likely that

Casas really believed the quota to be reasonable at the time

it signed the contract.18

In addition, inferences from the PRETS and

historical sales figures contained in Martinez's declaration



17. Cf. P.R. Laws Ann. tit. 30, 3372 (1991) ("The
contracting parties may make the agreement and establish the
clauses and conditions which they may deem advisable,
provided they are not in contravention of laws, morals, or
public order."); In re Pagan Ayala, 117 D.P.R. 180, 187 & n.4
(1986), Translated in, 17 Official Translations 216, 223 &
n.4 (1986) (suggesting that contracts exempting attorneys ex
ante from malpractice suits are void).

18. Casas argues that any evidence of reasonableness of the
quota at a time prior to the period of nonperformance was
irrelevant here. However, viewed in the light most favorable
to Mita, we think that evidence of reasonableness immediately
prior to the term of the contract was material. Combined
with Martinez's declaration indicating that the Puerto Rico
copier market did not subsequently decrease, but rather grew,
this evidence is probative of the continuing reasonableness
of the quota between April 1989 and May 1990, the relevant
period. See note 12, supra.

-44-

suggest that if the quota was reasonable when the contract

was signed, it remained so during the term of the contract.

The contract required Casas to sell 255 copiers (85% of 300)

during a 13-month period in order to retain its exclusive

dealership. This figure was not grossly out of line with

Casas's historical 12-month sales figures: (297 in 1985, 153

in 1986, and 230 in 1987). The PRETS figures indicate that

the market for copiers actually increased during the term of

the contract (from 7,056 in 1989 to 8,983 in 1990). If the

quota was based roughly on past sales, and if the market for

copiers did not suffer any decrease, it could be inferred

from this evidence that the quota was reasonable in light of

the Puerto Rico market.

Casas, to be sure, presented much persuasive

evidence in opposition. Summary judgment, however, is not a

substitute for trial. We do not think Casas's evidence so

undermined Mita's case that Mita can be said to have failed

to raise a genuine issue of fact concerning the

reasonableness of the quota. At most, it indicated that many

issues of fact remained to be resolved at trial. Casas

presented a declaration by its president, stating that he

thought the quota unreasonable and that Mita had imposed the

quota unilaterally by threatening to cancel their preexisting

distribution relationship. Mita's vice president, however,

asserted that he "relied on Casas' representations that the

-45-

performance goal and the related percentages were reasonable

for the relevant market." Mita's evidence tends to suggest

that the quota was arrived at through bargaining, Casas

having persuaded Mita to lower the quota from 500 to 300

copiers. The Casas declaration also states that Hurricane

Hugo and the local recession had an effect on the copier

market. As we have previously said, however, Mita's PRETS

figures minimized these effects by showing that the copier

market increased during the term of the contract.

Casas's strongest argument is that Mita's

statistical evidence of market growth and of past sales fails

to account for the fact that, prior to 1988, Casas was the

only distributor of Mita products for all of Puerto Rico

(even though its contract then was nonexclusive). By

contrast, during the term of the contract, Casas argues, it

faced stiff intrabrand competition. Its exclusive dealership

covered only a portion of Puerto Rico, the greater San Juan

area. While it could also sell Mita products elsewhere in

Puerto Rico on a nonexclusive basis, it now faced competition

from two other authorized Mita dealers outside the exclusive

San Juan area as well as from alleged unauthorized sales of

Mita's copiers by Caguas and Oficentro. According to Casas,

its competitors sold 327 Mita copiers during the 13-month

period of the contract. Casas argues that Mita's past sales

figures simply do not address the issue of this increased

-46-

intrabrand competition, hence they say nothing as to the

quota's reasonableness during the relevant period.

But we do not think that this argument so

undermines Mita's case as to eliminate any contested factual

issue. It is unclear how to assess the effects of intrabrand

competition in calculating the reasonableness of the quota.

The fact that other nonexclusive dealers were able to sell

327 Mita copiers during the relevant period outside of San

Juan is a double-edged sword. While, to be sure, these sales

suggest that Casas faced stern competition, it also indicates

the existence of a strong demand for Mita copiers on which

Casas was presumably free to capitalize to the extent it was

capable. It is unclear, moreover, in measuring quota

reasonableness, how intrabrand competition is to be

distinguished from the effects of competition from copiers

made by other manufacturers. Such interbrand competition

would have existed earlier as well as in 1989-90. While the

new factor of intrabrand competition doubtless weakens the

predictive value of Casas's earlier sales figures, it does

not totally vitiate their relevance to quota reasonableness.

Casas knew when it signed the contract that its exclusivity

would be limited to the San Juan area, and presumably also

knew of the intrabrand competition it faced elsewhere. The

evidence permits an inference that in Casas's then judgment

the quota was reasonable despite the anticipated interbrand

-47-

and intrabrand competition. Thereafter, the overall trend in

copier imports was up suggesting at least, as one possible

interpretation of the data that Casas's poor performance

was due not to lack of opportunity but to some fault of its

own.

We conclude that Mita presented evidence sufficient

to raise a genuine issue as to the reasonableness of the

quota. Particularly where the standard here,

"reasonableness," is so amorphous, and "hard" evidence to

prove "reasonableness" so obviously difficult to come by and

subject to multiple interpretations, we are disinclined to

deny Mita its day in court by raising the threshold barrier

of proof too high. See Rogen, 361 F.2d at 265-66 (suggesting

that delicate issues of fact "may well indicate a preference

for the antennae of the factfinder over the cruder instrument

of summary judgment"); Newell, 20 F.3d at 23 (deferring to

the jury's judgment that supplier failed to meet its burden

of proving that a quota was "reasonable" under Law 75). To

the extent that we have doubts about the appropriateness of

summary judgment, we are required to resolve them in Mita's

favor.

Throughout its brief, Casas repeatedly asserts that

Mita has failed to satisfy its burden of proving that the

quota is reasonable. This misapprehends the burden Mita

faces at summary judgment. Mita is not required to prove

-48-

that the quota was reasonable. Rather it was only required

to present evidence sufficient to raise a genuine issue of

fact as to reasonableness. The burden is one of producing

enough evidence to show that it is entitled to a trial, not

that it will necessarily be successful at trial. See First

Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-

89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1966) ("It is true that

the issue of material fact required by Rule 56(c) to be

present to entitle a party to proceed to trial is not

required to be resolved conclusively in favor of the party

asserting its existence; rather, all that is required is that

sufficient evidence supporting the claimed factual dispute be

shown to require a jury or judge to resolve the parties'

differing versions of the truth at trial.") We believe Mita

has satisfied this burden. We conclude that Mita has

presented evidence sufficient to raise a genuine issue of

material fact as to the reasonableness of the quota given the

condition of the Puerto Rican copier market. Weighing the

evidence, assessing the credibility of the experts: these are

task that must be left to the trier of fact.19



19. Without making too much of this, we note that Casas in
its brief almost concedes that there exist disputed issues of
fact. After listing the evidence it presented about the
unreasonableness of the quota, it states: "Among others, this
evidence raises material questions of fact as to the effect
of Hurricane Hugo, the recession, the intrabrand competition
of MITA machines, and the manipulation of statistical
information by MITA's expert in order to artificially create
a 'growing market'." We agree.

-49-

V.

In accordance with this opinion, we hereby dismiss

Caguas and Oficentro from this suit and remand to the

district court to determine whether the dismissal of Caguas

and Oficentro should be with or without prejudice. Having

determined that the district court erred in granting Casas's

motion for partial summary judgment, we vacate the court's

order granting Casas a permanent injunction. The parties'

claims will proceed in the district court consistently with

this opinion.20

So ordered. Each party shall bear its own costs.



20. We do not reach Mita's remaining argument that, even if
summary judgment was proper, the district court's issuance of
the permanent injunction was improper.

-50-